**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Tymar Distribution LLC
DISPLAY NAME: New England Express        CASE NO.

          Plaintiff,

v.

MITCHELL GROUP USA, LLC

and

RIVELLE PRODUCTS, INC., d/b/a
PricePRO,

          Defendants

## COMPLAINT FOR DAMAGES
### (JURY TRIAL DEMAND)

Plaintiff, Tymar Distribution LLC, Display Name: New England Express, brings this action under Florida law for damages caused by Defendants' (i) tortious interference with existing and prospective economic relations with Amazon, and (ii) violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),[1] based upon its personal knowledge as to facts pertaining to it, upon the investigation of its counsel, and upon information and belief.[2]

---

[1] This case was originally filed as Case No. 20-cv-719 (EDNY) under both Federal Antitrust Law and State law.  On March 31, 2021, the District Court dismissed the Antitrust Claims, dismissed the state law claims for want of personal jurisdiction, and declined to hear the state law claims under its supplemental jurisdiction.

[2] This District recently entertained a case similar to this case in *Solu-Med, Inc. v. Youngblood Skin Care Prods.*, No. 19-60487-CIV-ALTMAN/Hunt, 2020 U.S. Dist. LEXIS 115120 (S.D. Fla. June 4, 2020)

## NATURE OF THE ACTION

1.   Plaintiff sues in tortious interference under Florida common law because Defendants' false statements to Amazon interfered with Plaintiff's existing and prospective business relations with Amazon, a relationship which had been in uninterrupted effect for four (4) years prior to Defendants' wrongful conduct at suit.  Plaintiff also sues under The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Title XIII, Chapter 501, Section 501.201 et seq. because, through unfair trade practices directed at Plaintiff's relationship with Amazon, Defendants caused Florida residents to pay higher prices than they otherwise would have paid for Fair & White personal care products, as discussed hereinafter.

2.   This case is about greed disguised as "brand protection."  With the advent of Amazon has come a fight for the right (or wrong) to display goods in the ecommerce space owned and controlled by Amazon, i.e., amazon.com.  A former Investigation Specialist for Amazon's Seller Performance team, Chris McCabe, has written extensively about the misuse of the Amazon rights reporting system.  In his article, "Have you Noticed How Unpredictable Amazon's Notice Infringement teams are now?"[3] Mr. McCabe observes (Exhibit 1):

- Amazon's Notice Claim of Infringement Teams exist in theory to process intellectual property violations on the Amazon Marketplace at amazon.com;
- In practice, trademark and other violations can come from anywhere, allege anything, and are rife with abuse;
- The work of the Notice teams, though attempting to combat rampant abuse, has backslided of late to the point where Amazon's response to contested Intellectual Property Complaints makes "little to no sense;"
- Amazon harshly enforces the brand owner complaints of counterfeiting by requiring at most that brand owners attest to having "test bought" the allegedly counterfeit product from the alleged counterfeiter;
- Suspensions and expulsions from the Marketplace follow "bizarre behavior" on Amazon's part, where the reasons for adverse actions are highly mercurial, *re*stated

---

[3]   https://www.ecommercechris.com/have-you-noticed-how-unpredictable-amazons-notice-infringement-teams-are-now/(last visited May 9, 2021).

> repeatedly, and often have nothing to do with the reason for the suspension or expulsion; and
> - Accused sellers—in particular those with a history of notice claims (as many sellers have)--are left in a virtual "twilight zone" where they are not told and cannot learn the true reasons for harsh—at times lethal—action taken against their businesses.

3.    In one of the few cases such as this one in the United States, Mr. McCabe submitted his Declaration under pain of perjury which, generally speaking, identifies the Amazon "nuts and bolts" that provide the landscape for the at-suit events.  Exhibit 2.

4.    Unscrupulous brand owners and their cohorts, well aware of the above Notice Infringement landscape, take unilateral and concerted actions, often with "brand protection services" whose principal service is the destruction of intrabrand competition, to assist in "knocking off unwanted sellers."  Exhibit 1 at p. 2, ¶3.

5.    Plaintiff Tymar Distribution LLC, a Rhode Island business, operated within a market niche that serves as a valuable, efficient segment of the economy.  Succinctly, the model is sourcing products at wholesale, from an authorized distributor of a manufacturer, or from the manufacturer itself, or from a downstream purchaser, and selling it at an enhanced, retail price point online, but often at a cheaper price than other sellers are selling it, thus benefiting consumers, who get authentic product at a discount.

6.    Amazon testified in writing before Congress on October 11, 2019, stating that sourcing trademarked goods from a wide variety of resellers and reselling them is absolutely "legal:"[4]   There are many legal sources of authentic supply in addition to resellers specifically authorized by the brand. These include liquidation or sale by authorized

---

[4] http://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-20190716-SD038.pdf at p.31.  (last visited May 9, 2021)

retailers, and supply from other wholesalers and distributors – who are sometimes also used by brands themselves to move merchandise.

7.     Such grey market activities,[5] however, threaten the profits of manufacturers who attempt to maintain a system of Minimum Advertised Pricing.  See T. Johnson, Minimum Advertised Price (MAP) Violations & Policing Your Brand on Amazon, at http://www.cpcstrategy.com/blog/2015/05/minimum-advertised-price-map-violation-amazon/

8.     Manufacturers, their "authorized distributors," and their "brand protectors" often seek means—some unlawful-- to eliminate such niche, lawful market competition.[6] Elimination of discounters and discounted products--whether actual and potential competitors--from access to the Marketplace by joint collaborative action, directly at issue here, is an unlawful restraint of trade at common law and an unfair trade practice under Florida statute.

---

[5]"A grey market or dark market (sometimes confused with the similar term "parallel market") refers to the trade of a commodity through distribution channels that are not authorized by the original manufacturer or trade mark proprietor. Grey market products (grey goods) are products traded outside the authorized manufacturer's channel."
https://en.wikipedia.org/wiki/Grey_market#History_of_the_term

[6]A copyright or trademark holder enjoys a "distribution right" and may initially sell, or not sell, copies of a copyrighted or trademarked item to others on such terms as he or she sees fit. However, the IP holder's exclusive distribution right is limited to the first sale of the coyprighted or trademarked item. Under the "first sale" docrine, codified at 17 U.S.C. § 109(a) "the distribution right may be exercised solely with respect to the initial disposition of copies of a work, not to prevent or restrict the resale or other further transfer of possession of such copies."  The Fair Use Doctrine, similar to the First Sale Doctrine, permits a seller to use a another's trademark to identify the former's goods, provided that no likelihood of confusion results as to the source of the product or the trademark holder's sponsorship or affiliation.  15 U.S.C. §115(b)(5)(A)-(C). The First Sale Doctrine [also] protects resellers of genuine trademarked goods from claims of infringement. *Davidoff & CIE, S.A. v. PLD Int'l. Corp.,* 263 F.3d 1297, 1301 (11th Cir. 2001); *Hidalgo Corp. v. J. Kugel Designs, Inc*., No. 05-20476-CIV-JORDAN/TORRES, 2006 U.S. Dist. LEXIS 96647, at *12 (S.D. Fla. 2006)

9.    Plaintiff purchased relevant product, manufactured in France, from the exclusive United States distributor thereof, i.e., Defendant Mitchell Group USA, LLC ("MGU"), and did not repackage, modify, or otherwise change the product for resale.

10.   IP owners, frequently these days, purport to disclaim as to grey market goods the manufacturer's original or limited warranty, and thereby render "authorized" goods materially dissimilar from "unauthorized" goods for Lanham Act purposes.  Usually this purport is pretextual,[7] and Amazon's official policy is to encourage grey market resellers to list and sell such goods at amazon.com despite IP owner complaints that the goods infringe their IP as lacking warranty coverage embedded in "authorized" goods.

11.   Plaintiff  brings this action following its commercial and financial injury resulting from Defendants' successful exploitation of  Amazon's Notice Infringement protocols— specifically, Defendants' false statements to Amazon, alleging Plaintiff to be a counterfeiter, predictably causing Plaintiff's suspension from the Amazon Marketplace for 18 days, loss of sales of the relevant product for the life of the business, and other special damages attendant to the harm inflicted on the Plaintiff-Amazon relationship.

## JURISDICTION AND VENUE

12.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the citizenship of the parties is diverse and the amount in controversy is in excess of $75,000, exclusive of costs and interest.

13.   Tymar was duly formed on December 23, 2016 as a Rhode Island limited liability company, with its principal place of business in Providence, Rhode Island.  Tymar's sole

---

[7] See McCabe, Exhibit 1 at p.2, ¶3 ("Often, this involves weak arguments that items sold without the relevant warranty constitutes a not "new" item…")

and managing member, Tyson Zahner, is a resident of Rhode Island and has thus resided at all relevant times.

14.     Mitchell Group USA LLC ("MGU") is a limited liability company duly organized under Florida law, with its principal place of business in Miami, Florida. On information and belief, no member of MGU is a resident of or domiciled in Rhode Island. MGU's Managing Member, Michel M. Farah, is a resident of Miami, Florida.

15.     Rivelle Products, Inc., dba PricePro (at times "Rivelle" or "PricePro") was duly formed as a California corporation on April 11, 2016 and was domiciled, with its principal place of business, in California until, on or about January 19, 2021, Rivelle Products, Inc. of California merged into Rivelle products, Inc. of Florida, the latter-surviving corporation having been duly formed under Florida law on January 14, 2021.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because MGU and Rivelle are residents of this District and a substantial part of the events giving rise to the claim occurred in this District.

17.     Rivelle's Articles of Merger are file no P21000002572.[8] Rivelle's office address in Florida is 9858 CLINT MOORE RD STE C111-261, BOCA RATON, FL 33496. Rivelle's statutory agent upon whom service will be made is Cogency Global, Inc., 115 N. Calhoun St., Ste. 4, Tallahassee, FL 32301-1568.

18.     Additionally, the Court has general personal jurisdiction of Rivelle under Fl. Stat. §48.193(1)(a)1 because Rivelle operates a business in Florida or maintains an office or

---

[8]

http://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2021%5C
0121%5C58429176.Tif&documentNumber=P21000002572

agency in Florida, at 9858 CLINT MOORE RD STE C111-261, BOCA RATON, FL 33496.

19.    Additionally, the Court has general personal jurisdiction of Rivelle because Rivelle had a distribution relationship with co-Defendant MGU for approximately two years, during which time the parties continuously transacted business in Florida of a value of at least several hundreds of thousands of dollars at minimum, i.e., at least $25,000 per month. Specifically, at relevant times Rivelle had the "Buy Box"[9] at least 80% of the time.[10]  At least 82% of sales go through the Buy Box,[11] as the default seller.  Plaintiff's managing member summarizes the value of the Rivelle-MGU relationship as follows:

> In September 2018, we did $11,559 in Fair and White Sales on Amazon. This was all the while being attacked daily with false Infringement claims. This $11,559 was for the 28 ASINS we were carrying.
>
> Best case scenario I suspect we were able to get the buy box for 20% of the time in the month of September. That means that the other 80% of the time Pricepro would have controlled the buybox because they had eliminated all competitive sellers through their IP complaints.
>
> Based on this math, their sales just on these ASINs, would have been roughly 4x (20% versus 80% buy box control) our revenue for a total of $46,236 in the month of September. This does not take into account the fact that Rivellepro was also selling many other Fair and White products that we did not choose to carry. Based on the order form I have from Mitchell Brands there was approximately 108 Fair and White products available for purchase and we were only carrying about 28 of them.

---

[9] "The Buy Box refers to the white box on the right side of the Amazon product detail page, where customers can add items for purchase to their cart.  Not all sellers are eligible to win the Buy Box." https://www.bigcommerce.com/blog/win-amazon-buy-box/#what-is-the-amazon-buy-box

[10] MGU dba "Beaty Dreams" would not ordinarily have had the Buy Box because Beauty Dreams was Fulfilled by Merchant (FBM) rather than Fulfilled by Amazon (FBA).  Only if Rivelle was out of stock, if then, would Beauty Dreams have had the Buy Box.  Of course, for every dollar of product sold by Beauty Dreams FBM, Rivelle would have product sales of four dollars.

[11] *Id.*

> Once they successfully removed us from the marketplace and if RivellePro only carried the 28 ASINS we did, the minimum amount of sales Per month for them would have likely been $57,795 per month.
>
> I believe this to be a very conservative estimate of their actual revenue in Fair and White product sales.

Florida law authorizes jurisdiction over the person of a foreign corporation where there are continuous and systematic general business contacts between the state and the foreign corporation, *Achievers Unlimited v. Nutri Herb*, 710 So. 2d 716, 720 (Fla. Dist. Ct. App. 1998).

20.   In addition to its relationship with MGU, Rivelle had and has an even longer-term relationship with at least one other Florida company, to wit: Fresh Brandz, LLC, 6201 Johns Rd Ste 11, Tampa, FL 33634-4434.  Fresh Brandz distributes Fresh Kidz products in the USA.  Rivelle continuously transacted Fresh Kidz business in Florida over the last 2-3 years of a value in the hundreds of thousands of dollars.  Specifically, Rivelle was the exclusive Amazon representative for Fresh Kidz deodorants.[12]  Based on the category and sales rank for each ASIN listed by PricePro on Amazon, the value of the Fresh Brandz-Rivelle relationship was roughly $37k per month in Sales on Amazon.  Assuming $20,000 of monthly Fresh Kidz purchases by Rivelle over the last 2-3 years, Rivelle has purchased over $500,000 of Fresh Kidz products from Fresh Brandz.[13]

21.   PricePro's relationships and purchase continuum in Florida during the past years are, as to each relationship and/or combined, sufficient to afford general jurisdiction of Rivelle under Fl. Stat. §48.193(2): "A Defendant who is engaged in substantial and not isolated activity

---

[12] See, e.g., "Girls Pink" deodorant, for which on May 7, 2021, PricePro was the only seller. https://www.amazon.com/Fresh-Kidz-Natural-Deodorant-Protection/dp/B00GXORHF8/ref=sr_1_3?dchild=1&m=AE8Y9OUATA2KS&qid=1620411811&s=merchant-items&sr=1-3

[13] PriceChecker2 (PC2) software was used to calculate rough sales per month.

within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, **whether or not the claim arises from that activity."** (bold ours)

22.     In addition to the foregoing, the Court has specific personal jurisdiction of Rivelle for reasons which Rivelle claims are covered by a confidentiality order between the parties entered in prior litigation.  Although Plaintiff disagrees with Rivelle, in the interest of moving this case forward, Plaintiff will defer pleading the relevant specific personal jurisdictional facts at this time and revisit the issue if the need to do so arises.

23.     Rivelle maintained at relevant times a fully interactive online presence as PricePRO, an unregistered fictitious name, and was an exclusive FBA distributor on Amazon of some or all items in GMU's line of over 100 Fair & White ("F&W") products listed for sale on the Amazon platform.  Florida residents obtained information as to Fair & While products and purchased such products through Rivelle's aforesaid interactive Amazon storefront. Florida residents were harmed by the conduct at suit by reason of elimination of price competition for MGU products and resultant artificially higher prices.

## PARTIES

24.     MGU is the exclusive United States distributor of certain French-made personal care products including its F&W line of creams, soaps, gel, etc.  GMU maintains an Amazon merchant store, "Beauty Dreams," Merchant Token A1HXFVCMDLK67V.

25.     Tymar became a third-party seller on Amazon in 2014 and operated continuously thereafter until the events at suit.

26.     Rivelle commenced operations as a mail order source of health and beauty products in 2016 and added "electronic shopping" as a second endeavor.  Rivelle conducts "electronic

shopping," to be described hereinafter, as PricePRO, an unregistered fictitious name, and is an exclusive FBA distributor on Amazon of all or substantially all items in GMU's line of approximately over 100 Fair & White products listed for sale on the Amazon platform.[14]

27.   PricePRO "electronic shopping" services include "brand protection" services which, in concert with MGU, injured Plaintiff's Amazon relationship.

## AMAZON AND MARKETPLACE SELLERS

28.   Pursuant to Amazon's standard Business Solutions Agreement, third-party sellers provide content for product offerings, and are responsible for ensuring that the provided content and products are lawful.[15]

29.   When a third-party seller wants to offer a product for sale on amazon.com, the seller must first determine whether the product already exists in the amazon.com catalog. (ASIN Creation Policy).[16]  Multiple sellers can offer the same product for sale. If the same product already exists in the catalog, the seller can add specific details – including price and product condition and any additional product details – and its offering is listed, along with other sellers of the same product, on or a click away from the same product detail page.

30.   If the product is not already in the catalog, a third-party seller can create a new product listing. To do so, the seller must send Amazon, via an automated file upload system, content related to the new product, including the product description, an image of the product, and the product's price.

---

[14] Amazon's Fulfillment by Amazon ("FBA") division provides logistics of goods storage, delivery, and customer service.
[15] Many of the factual allegations in of the Complaint, ¶¶28-33 are substantially quoted from a Declaration of Jonathan Schelle in Support of Motion for Summary Judgment, submitted by *Amazon in Lasoff v. Amazon.Com, Inc*., No. 2:16-cv-00151-BJR (W.D. WA  12/5/16), Docket No. 50.
[16] Each unique product offered for sale on amazon.com is assigned an Amazon Standard Identification Number ("ASIN").

31.     This seller-supplied content is then used to automatically generate a "product detail page."[17] The third-party seller is responsible for the uploaded content, and specifically represents and warrants that it has the right to grant Amazon a license to use all seller-provided content, trademarks, and other materials. **This license is then available such that all sellers of the same product are permitted to list such product on the product detail page.**

32.     Amazon represents that its role with respect to seller-submitted content and product offerings is limited and passive.  Amazon represents that it does not suggest prices for third-party offerings, or generally involve itself in third-party sales except to set parameters on terms and conditions of use.  Those parameters include a third-party seller's agreement to be bound by Amazon's policies, including acknowledgment that "[p]roducts offered for sale on Amazon.com must comply with all laws and regulations and with Amazon's policies."  Under Amazon's Intellectual Property Violations Policy, third-party sellers are responsible for ensuring that the products they offer for sale are legal. ("Sellers are responsible for ensuring that the products they offer are legal and authorized for sale or re-sale."). All products offered by third-party sellers are owned by the third-party sellers, not Amazon.

33.     Amazon's policies, to which all Amazon participants bind themselves, i.e., to which MGU and PricePRO bound themselves, explain that sellers may list their products for sale against pages that another seller has created with one proviso, namely, that <u>they are selling the same product</u>:

---

[17] A "product detail page" is a webpage that displays the product offering in the amazon.com marketplace, including the product name, photos, and description.  *Id.* ¶ 9

**Detail Page Ownership and Image Restrictions:** When a detail page is created, it becomes a permanent catalog page on Amazon.com that will remain even if the creator's inventory sells out. Additionally, when you add your copyrighted image to a detail page, you grant Amazon and its affiliates a nonexclusive, worldwide, royalty-free, perpetual, irrevocable right to exercise all rights of publicity over the material.

Other sellers can list their items for sale against pages that you have created or added your copyrighted images to. However, we do require sellers to list only against detail pages that exactly match their items. If you believe sellers are listing against detail pages that do not exactly match their items, we ask that you report the violation directly by using the contact us form.

34.    Allowing all sellers to list the same product on the same page generates intense price competition that is highly beneficial to consumers, who understand that Amazon presents the Marketplace's entire array of a given ASIN on the same product detail page. Eliminating low-priced competitors is injurious to competition and to consumers.  Many or most online buyers view Amazon as one-stop shopping and look no further.  Such consumer behavior is fundamental to Amazon's business plan.

35.    Amazon's policies prohibit third-party sellers from violating the intellectual property rights of others.  If a product listing is determined to be counterfeit, expired, defective or otherwise inferior to the ASIN, to be in violation of third-party intellectual property rights, or to otherwise violate Amazon's policies, Amazon may block the listing or, in certain circumstances, terminate the third-party seller.  Before it can act, Amazon must, according to its own written policies, determine whether the reported item or items do actually infringe on another seller's rights.  To do so, Amazon represents to the public that it conducts an investigation, typically by asking the reporter of the alleged infringement to establish their intellectual property rights, to conduct test purchases of the allegedly infringing products, and to provide Amazon with material differences between the

reporter's product(s) and the alleged infringer's product(s). Amazon publicly holds out that it requires evidence of infringement for each product that it is asked to take down, as it cannot assume that because one product is infringing, all of that seller's products are infringing. Part of the basis of this litigation, as noted in Chris McCabe's article and declaration (Exhibits 1-2 hereto) is Amazon's laxity in implementing the foregoing procedures and protocols it publicly holds out as applicable to claims of product counterfeiting, thereby allowing unscrupulous Rightsowners and those purporting to be Rightsowners to accomplish a purpose of limiting price competition regardless of product authenticity.

36.   Amazon knows that many or most of the infringement complaints it receives from complaining sellers are falsely premised upon the notion that grey market goods may not be sold using intellectual property belonging to a remote manufacturer or other Producer. Amazon has testified to this matter before the United States House of Representatives, to the effect that IP owners "conflate" their exclusive IP rights with their non-exclusive rights to list trademarked goods on Amazon.[18]   Nevertheless, Amazon acts upon such ill-conceived infringement complaints, thereby acquiescing in the compromise of Marketplace competition. The protocol is routine, institutionalized and at times lethal to competition and potential competition. Consumers are harmed, obviously.

---

[18] Amazon testified on this misnomer before the United States House of Representatives, focusing on Rightsowners' misconception vis-à-vis sellers such as Plaintiff, stating that "competitive prices" depend upon the "unauthorized sellers'" ability to sell authentic products. *Id.* http://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-20190716-SD038.pdf

## THIRD-PARTY SELLERS' LISTING AND NON-CHANNEL SALE OF GOODS

37.   The grey market, also referred to as the parallel market, is a market where a product is bought or sold outside of the manufacturer's authorized trading channels, for example, Plaintiff's retail sales of MGU's F&W line of products.

38.   Third party sellers on Amazon typically purchase goods only to resell them on the Marketplace for a profit.  Such sellers may undercut other Sellers, including those who have intellectual property rights embedded in grey market products being marketed. Producers and their "authorized dealers," in particular, are thus incentivized to eliminate undercutting sellers, both to retain value perceptions in the public marketplace for "their" products and, more immediately, protect their own profit margins.

39.   As stated in Amazon's policies quoted above, it is completely lawful for third-party sellers to purchase grey market goods and sell them on Amazon.  Indeed, such products are by design placed on the same product detail page usually created by a trademark holder, copyright holder, or affiliate, **who has agreed in BSA to compete with "unauthorized" sellers on the product detail page.**  Amazon's established policy is that grey market products may be offered alongside a rightsholder's offering—indeed, such goods may create the product page-- as long as the third-party seller's offering is "the same product" as described by brand, name, ASIN, etc.

40.   Well-established doctrines make clear that trademark and copyright laws do not prevent the purchasers of trademarked or copyrighted items from re-selling them without permission from the owner of the trademark or copyright.  The First Sale Doctrine permits a reseller to use a Plaintiff's trademark to identify Plaintiff's goods so long as no likelihood of confusion results as to the source of the product or the trademark holder's sponsorship

or affiliation (e.g., "authorized dealer").   15 U.S.C. §115(b)(5)(A)-(C).   The First Sale doctrine [also] protects resellers of genuine trademarked goods from claims of infringement. *Davidoff & CIE, S.A. v. PLD Int'l. Corp.,* 263 F.3d 1297, 1301 (11th Cir. 2001); *Hidalgo Corp. v. J. Kugel Designs, Inc*., No. 05-20476-CIV-JORDAN/TORRES, 2006 U.S. Dist. LEXIS 96647, at *12 (S.D. Fla. 2006).

41.   The Marketplace is thus routinely presented with multiple sellers of the same product on the same page, as specifically provided in the BSA, agreements signed by Rightsowners, and Amazon formal policies.

## STATEMENT OF FACTS

### A.  Tymar: History of Success without Controversy

42.   Prior to becoming an Amazon seller in 2014 Plaintiff executed Amazon's standard Business Solutions Agreement that, among other things, allowed Amazon to terminate Plaintiff's selling privileges as a seller for any reason or for no reason at all.   One of the conditions of the BSA was Plaintiff's adherence to Amazon's policies, such as its anti-counterfeiting policy.

43.   During 2018 Plaintiff routinely listed approximately 300 brand names on amazon.com, and sold over 150,000 units of product to customers on Amazon with a 99% lifetime positive feedback rating.   Plaintiff experienced $425,498 in sales during its last six months of unimpaired 2018 Amazon operations, at 22.74% net margin, or $96,819 in profits, i.e., monthly profits of approximately $16,150.   Plaintiff's profit margin on F&W products was 22.1%.   As a direct result of MGU IP Complaints, Plaintiff's thriving Amazon business was suspended from Oct 18, 2018 to November 6, 2018. Plaintiff's Q4, the busiest time of the selling year, was seriously disrupted.   In order to obtain reinstatement, Plaintiff was

coerced into agreeing to refrain from competing with Defendants in the F&W space on Amazon.   Had Plaintiff not advanced $5,500 for an outside "consultant" to obtain reinstatement, all would have been lost.  Having gained reinstatement, Plaintiff has steadily grown in sales volume until, as of 2020, Plaintiff had Amazon sales of over $2,000,000.

44.     Whilst selling on Amazon Plaintiff offered many F&W products, all completely authentic, ***purchased from MGU itself***, at prices at or below MGU's MAP pricing. Indeed, Plaintiff sold approximately $28,350 worth of F&W items between May 17, 2018 and Oct 18, 2018.

45.     MGU never complained of Plaintiff as a counterfeiter—not once-- until it came under Rivelle's influence in mid-2018.  At that point MGU/PricePRO dealt Plaintiff a low blow that threatened its future as an Amazon seller.

**B.  PricePRO**

46.     Rivelle dba PricePRO was founded as a third-party seller on the Amazon marketplace in or about 2016, and possibly earlier as Pacific Beauty:

> PricePRO is    a    Top-Rated seller trusted    by    more    than    five
> thousand Amazon.com customers in the US. They have been selling on
> the Amazon.com marketplace since 2016. They sell in Beauty & Personal
> Care department from Mirabella, FAIR & WHITE, Norvell, Mixed Chicks,
> DermOrganic and other brands.[19]

47.     Prior to the at-suit events PricePRO transitioned to a company with a diverse set of digital and supply chain capabilities, and expertise in "pulling the levers" at Amazon, thus adding e-commerce marketplace services to its portfolio of ecommerce seller expertise.

48.     All the while, however, PricePRO is and always has been an active third-party seller on Amazon, just as MGU.  Its seller profile as of February 2, 2020 showed 1,750 ratings or

---

[19] https://www.sellerratings.com/amazon/usa/PricePRO  (last visited May 13, 2021).

reviews over a 12-month period. Exhibit 3.   On information and belief, about .5% of purchasers post a review, although some sellers post fake reviews at a far greater rate. Assuming PricePRO is not a "fake reviewer," its review numbers suggest sales of products over a one-year period of about 350,000 items at an average price of $30,[20] or roughly $10,500,000, much in health, beauty and personal care products, i.e., the same segment as MGU and Tymar.

49.     But PricePRO, as a *retailer-brand manager hybrid* quietly offers something that few other third-party sellers offer, to wit: "brand control and compliance services," otherwise known as MAP protection from "unauthorized sellers" on Amazon.

50.     PricePRO used MGU's proprietary email domain as one of the means to anonymously accomplish its unlawful purposes as hereinafter described, to wit: ecommerce@mitchellgroupusa.com; Amazon would not tolerate PricePRO's conflicted infringement-reporting activities.[21]   Although the domain belongs to MGU, and this address was ostensibly shared by MGU's employee Linda Patty, the IP Complaints at issue emanated from PricePRO.  Only by happenstance did Plaintiff learn of PricePRO's role.

---

[20] https://www.marketplacerating.com/amazon/usa/PricePRO
[21] Anonymity, i.e., not registering with the State and using MGU's email domain allows PricePRO to evade Amazon policy directed at anti-competitive conduct:

**Filing Infringement Notices as an Agent or Brand Protection Agency**
     Amazon understands that many brands may choose to have brand protection agencies or agents report intellectual property infringement on their behalf and accepts submissions from authorized agents. However, Amazon does not permit individuals with active selling accounts to file infringement notices as an agent of a brand when the filing of those notices could benefit their own selling account (through removing competing listings, for example). Any sellers filing notices as an agent to benefit their own status as a seller may have their selling account terminated.

 https://sellercentral.amazon.com/forums/t/new-policy-filing-infringement-notices-as-an-agent-or-brand-protection-agency/533936  (last visited May 9, 2021)

51.   PricePRO's MAP protection services lay at the heart of this case.  Specifically, PricePRO became MGU'S exclusive authorized Amazon seller, as to substantially all of MGU's items, by virtue of the parties' agreement and understanding that, at least as to Amazon sales, PricePRO would keep MGU'S F&W line of products at MAP price levels by causing the listings of lower-priced, "unauthorized" (competing) sellers, generally, to be "taken down."

52.   Plaintiff believes that other competitors were similarly driven from Amazon Marketplace competition for sales of F&W products, including without limitation Mega Fountain, an active F&W seller that was also known as Olive Brand Merchandise at relevant times.

### C.  Circumstances of Plaintiff's Injury

53.   In late-April 2018 Plaintiff applied to become an MGU customer, and was welcomed aboard, provided catalogue information, and provided the ability to purchase F&W products directly from MGU in Miami, Florida.  At no time during the application process did MGU communicate, or request Plaintiff to agree, that Plaintiff would refrain from selling MGU products on Amazon.

54.   Plaintiff's first purchase of F&W product, Order 14460, was invoiced on May 3, 2018 for $2,845.68; the second Order 14555 was invoiced on May 21, 2018 for $3137.92; and the third order 14711 for $3,213.56 was invoiced on June 14, 2018.  Exhibits 4.1 through 4.3.

55.   On May 29, 2018 MGU (really PricePRO) sent Tymar, directly, a warning under the Digital Millennium Communications Act ("DMCA"), complaining of copyright infringement, simultaneously offering to withdraw the notice provided Tymar would refrain from selling F&W on Amazon.  Tymar did not agree.  This pattern would recur

throughout the summer and fall of 2018 . . . only with increasing intensity until the purpose of the notices vis-à-vis Plaintiff, i.e., cessation of platform competition, was realized.

56.     The notion stated in the 'cease and desist' letter, i.e., that F&W's warranty did not convey with F&W sales by Tymar, is pretextual and untrue.  See Exhibit 5 (no concern about sales except on Amazon).

57.     As a matter of policy and specifically here, Amazon will not sanction a third-party seller, i.e., Plaintiff, for lawfully reselling trademarked-copyrighted goods as an "other seller" on the product detail page for a given ASIN.  Accordingly, MGU/PricePRO did not complain to Amazon of any infringement at this point; rather, it used the DMCA notice to induce Tymar, through intimidation and artifice, to cease its Amazon competition.  The DMCA notice did not request that Tymar cease non-Amazon F&W sales.  *Id.*

58.     MGU's next step was to lodge IP Complaints with Amazon on or about June 22-23, alleging copyright infringement and trademark infringement.  See Tymar email to MGU of June 24, 2018 on Exhibit 10.

59.     Tymar promptly engaged expert Amazon counsel, Rosenbaum & Fumalaro ("R&F") to intercede with MGU.  Exhibit 6.

60.     Just prior to this point in time MGU established third-party seller PricePRO as its Amazon brand protector and gave PricePRO exclusive or substantially exclusive access (along with MGU itself, i.e., Beauty Dreams) to the most popular F&W products.  PricePRO would admit its role as "brand protector" during negotiations with Plaintiff's counsel in the summer and fall of 2018.

61.     From June 25 to October 2, 2018 R&F negotiated with PricePro, posing as MGU.

62.     Also, during this period of negotiations, from July 9, through July 13, 2018, MGU/PricePRO filed approximately 12 IP Complaints accusing Tymar of the far more serious charge of counterfeiting . . . instead of the failed DMCA accusations of trademark and copyright infringement.[22]  Per Amazon policy the subject F&W listings were "taken down."  In each case Tymar produced its invoices from MGU and Amazon reversed the take-down and restored the listing.  Exhibit 7.1-7.2.

63.     On July 13, 2018 Amazon took down Plaintiff's listing of ASIN B0011X58IE, stating it is "Generic or different than the detail page."  This take down was a direct result of MGU/PricePRO's IP Complaint for this ASIN.

64.     Also, on July 13, 2018 MGU-PricePRO made a "test buy" of ASIN B0011XC30A ("So White Exfoliating Soap") from Tymar, Order No. 114-6791051-1085832.  Exhibit 8.1 Plaintiff filled the order with product purchased directly from MGU under Order 14711 dated June 14, 2018.  Exhibit 8.2.  MGU filed a complaint on the item and Amazon first "took down and then retracted that IP Complaint on July 13th.  Exhibit 8.3. (ASIN B0011XC30A).  Any attestation by PricePRO/MGU of a good faith belief in a counterfeiting accusation could only have been predicated upon this test purchase of

---

[22] In its testimony to Congress, Amazon sharply distinguished between "unauthorized" sellers selling authentic product and counterfeiters:

> Amazon goes to great lengths to assure the authenticity of products, preventing bad actors from opening selling accounts or selling counterfeit products in its store. But we do not require that sellers have a direct contractual relationship with a product's manufacturer, as doing so could prevent sellers—many of whom are small and medium sized businesses—from legally selling these products in our store at competitive prices.

MGU's own distributed product.[23]   Amazon does not scrutinize IP owners or agent's attestations supporting an IP Complaints.  See Mc Cabe Declaration, Exhibit 2 at ¶15.

65.     In all, 41 IP complaints with not a particle of truth!  Amazon retracted all such IP Complaints with virtual absolution to Plaintiff (Exhibit 9):

> Thank you for providing information to resolve this issue. We reviewed all the information submitted and determined that your listings below match the detail page descriptions. Any listings that may have been removed should be active again.

66.     Undeterred, MGU-PricePRO filed another IP Complaint on July 27, 2018 and finally prevailed with Amazon to take down Plaintiff's listings for ASINs B00174GJC6, B00A2SYILW, B00FZ1P4SC, B00FZ0HLR0.   On information and belief based on Amazon's requirements of attestation of IP Complaints, MGU-PricePRO lied to Amazon regarding the "test buy" made on July 13th.

67.     R&F sent a letter to Amazon on August 3, 2018 strongly criticizing the take downs of Tymar listings.  Exhibit 11.

68.     Meanwhile MGU-PricePRO continued to send IP Complaints falsely accusing Tymar of counterfeiting, e.g., on August 10 and 18, September 27 and October 2, 2018.

69.     As of October 2, Tymar had perfect sales metrics as reported by Amazon, save and except 41 IP Complaints initiated by MGU-PricePRO.

70.     Finally, on or about October 2, 2018, PricePRO-MGU's relentless pursuit of Tymar though dozens of Rightsowner Complaints aforesaid succeeded in overwhelming all countervailing showings Tymar could bring to bear, including its theretofore perfect

---

[23] MGU-PricePRO's IP Complaints were filed so frequently and furiously that we cannot be certain which retractions reflect which IP Complaints.  Amazon appears to assign different Complaint ID's to the same essential matter at different points in the IP Complaint process.  Jeff Bezos' Escalation team reinstated 10's of products in a single email.  Exhibit 8.4.

record.   Following the October 2d IP complaint, Plaintiff was suspended on October 18, 2018.  See Exhibit 6.

## REVELATION OF PRICEPRO'S ROLE

71.   During R&F's discussions with PricePRO (posing as MGU) PricePRO finally revealed to R&F that *it, a former R&F client,* was providing "brand protection" services to MGU.

72.   On or about October 2, 2018 PricePRO demanded that R&F cease its representation of Plaintiff due to R&F's previous representation of Price-PRO in a matter substantially related to the Tymar representation.  See Rule 1.9, New York Rules of Professional Conduct (conflicts of interest vis-à-vis former clients).

73.   Plaintiff's Amazon account selling privileges were suspended on October 18, 2018, as stated above.  Without a seller retraction Tymar was helpless to prove its case.  See McCabe Declaration, Exhibit 1 at ¶13.

74.   With its entire business shut down, Tymar had no alternative, in mitigation of its damages, but to hire a consultant for $5,500 and thereafter agree to cease its sales of F&W products on Amazon in exchange for MGU's retraction of IP Complaints and concomitant account reinstatement.  Exhibit 10.

75.   The parties agreed that MGU-PricePRO would retract its false IP Complaints if Tymar would promise not to sell F&W products on Amazon, as the following correspondence (Exhibit 10) attests:

> <ecommerce@mitchellgroupusa.com> **Cc:**
>
> **Sent:**
>
> Mon, 22 Oct 2018 14:27:33 -0400
>
> **Subject:**

Re: Complaint ID 5146776971 and 5152722311

[Tymar] Agreed- will have to provide you our email address for our amazon store, different than this one and a list of asins because we were even hit with asins we have not carried

Sent from my iPhone

On Oct 22, 2018, at 2:20 PM, ecommerce@mitchellgroupusa.com wrote: [PricePro] We will agree to the retraction.

You are able to sell Fair & White on other outlets outside of Amazon. Please confirm by responding and we will issue the retraction.

76.    MGU's complaints concerning Plaintiff's sales of F&W on Amazon were, purely and simply, a matter of eliminating competition on the Amazon Platform.  Any justification for the IP Complaints, to wit: lack of manufacturer's warranty (which Amazon would not recognize as a valid distinction) and counterfeit (which Amazon is quick to sanction) were and are purely pretextual.  The above October 2d emails show clearly that MGU's only issue with Tymar was the latter's marketing of F&W products on Amazon and not otherwise.

77.    Plaintiff lost and continues to lose profits by reason of being suspended from the Amazon Marketplace and coerced to cease selling F&W.  Plaintiff sustained the following damages, all of which flowed from Defendant's interference with Plaintiff's long-standing Amazon relationship:

    a.   Lost profit to date by not selling F&W ………………….……$300,000

    b.   Lost "F&W" profit for additional seven (7) years …………....700,000

    c.   Lost profit during 18-day suspension ..........................................18,000

    d.   Fees to Amazon to recover F&W product .......................................350

    e.   Expert fees to achieve reinstatement...............................................5,500

f.   Legal fees to R&F ..............................................................2,005

## **HARM TO CONSUMERS**

78.    From mid-2018 when PricePRO and MGU contracted, Plaintiff's competition and that of other "unauthorized" sellers in the F&W space was eliminated and prices for relevant products were stabilized at artificially high, i.e., anticompetitive levels.  Output has been restricted, particularly in the sense that "other sellers" are not listing, and therefore cannot provide, products that MGU (Beauty Dreams) and PricePRO do not have in stock (which occurs frequently).  Consumers have thus been harmed.

79.    The effects on competition, i.e., prices to consumers, are clearly discernible as illustrated by price movements of three popular F&W products during the period:

- As of mid-2018 Fair-White-Original-Serum-One/product/  ASIN had sold for between $6 and $14.50 since 2014.  With the advent of PricePRO's methodologies, the product consistently sold (pre-litigation) at between $14 and $39.99:[24]

---

[24] https://camelcamelcamel.com/Fair-White-Original-Serum-One/product/B00176YZUM



- As of mid-2018 Fair & White So White Skin Perfector Lightening Cream with 1.9% Hydroquinone, 50ml / 1.7fl.oz. (B0011X58IE) had generally sold for between $4 and $12 since 2012.  With the advent of PricePRO's methodologies, the product stabilized from July 2018 (pre-litigation) at between $14.32 and $14.99[25]

---

[25] https://camelcamelcamel.com/White-Perfector-Lightening-Hydroquinone-1-7fl-oz/product/B0011X58IE



- As of mid-2018 Fair & White So White Skin Perfector Lightening Cream with 1.9% Hydroquinone, 50ml / 1.7fl.oz. (B0011X58IE) had generally sold for between $7 and $10 since 2016.  With the advent of PricePRO's methodologies, the product generally stabilized from July 2018 (pre-litigation) at $18.99.[26]

---

[26] Exceptions https://camelcamelcamel.com/Original-Lightening-Brightening-Hydroquinone-4-23fl-oz/product/B00176WU7W



**Count I: Interference with Existing and Prospective Business Relationships**

80.     The averments of paragraphs 1 through 79 are repeated and realleged as if fully set forth

        herein.

81.     The elements of tortious interference under Florida law are: "(1) the existence of a business

        relationship [or contract] . . . (2) knowledge of the relationship on the part of the Defendant;

        (3) an intentional and unjustified interference with the relationship by the Defendant; and

        (4) damage to the Plaintiff as a result of the breach of the relationship." *Ingenuity, Inc. v.

        Linshell Innovations Ltd.*, No. 6:11-cv-93-Orl-28KRS, 2014 U.S. Dist. LEXIS 40336, at

        *11 (M.D. Fla. Mar. 25, 2014)(quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647

        So. 2d 812, 814 (Fla. 1994))." *Allstate Ins. Co. v. Auto Glass Am., LLC*, 418 F. Supp. 3d

        1009, 1020-21 (M.D. Fla. 2019).

82.     As of October 2, 2018 Plaintiff was a third-party seller on Amazon and thriving.   Experts

believe that Amazon third-party sellers who, as Plaintiff, pass a threshold of <$1MM in annual sales, known as "Top Sellers" (such as Tymar), have considerable longevity in their Amazon business relationship.  See https://www.marketplacepulse.com/articles/veteran-amazon-sellers-still-at-the-top (last visited May 9, 2021).

83.    Defendants counterfeiting IP Complaints, made solely to Amazon, were false.  They accused Plaintiff of criminal conduct, namely, counterfeiting.  They were made for the improper purpose of suppressing competition.   Any one of the three preceding attributes of Defendants' conduct constitutes "wrongful means."

84.    Defendants' use of wrongful means interfered with and was inextricably entwined with Plaintiff's business relationship with Amazon, and proximately caused Plaintiff's suspension.

85.    Defendants' statements were made maliciously and with ill will, as business entities do not lie about competitors absent a strong measure of ill will.

86.    Amazon stated that it took Defendants' accusations very seriously and suspended Plaintiff as an Amazon third-party seller after receiving 41 IP Complaints.

87.    Amazon stated that it would act favorably if MGU would retract its accusations, without further harm to Plaintiff; but, despite all manner of attempted rectification, Plaintiff was coerced into foregoing his lucrative F&W business in order to secure the retractions and stem its losses.

88.    Defendants' acts harmed Plaintiff's relationship with Amazon, thereby causing the shutdown of Plaintiff's business from October 18th for 18 days.

### Count II: Florida Deceptive and Unfair Trade Practices Act (FDUTPA)

89.   The averments of paragraphs 1 through 88 are repeated and realleged as if fully set forth herein.

90.   Rivelle actively advertised, offered, and provided its services to MGU in Florida, culminating in the parties' contract and ensuing wrongdoing hereinbefore alleged.

91.   Plaintiff, a competitor, was harmed by the unfair trade practices of Defendants, i.e., misrepresentation, accusation of criminal conduct, and elimination of price competition.

92.   Consumers in Florida were harmed due to stabilized pricing of MGU products at artificially high levels as above alleged.

93.   Plaintiff suffered causally-related actual damages as hereinbefore alleged by reason of the unfair trade practices. *ADT LLC v. Alarm Prot. Tech. Fla., LLC*, No. 12-80898-CIV-RYSKAMP/HOPKINS, 2013 U.S. Dist. LEXIS 190106 (S.D. Fla. Apr. 18, 2013).

### JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Tymar Distribution LLC dba New England Express demands judgment in its favor, together with the following relief:

1.   Actual Damages, in an amount not less than $1,025,855, to be determined at trial;

2.   Punitive damages for tortious interference;

3.   Attorney fees and costs;

4.   A declaration that Plaintiff did not violate the intellectual property rights of MGU; and

5.   Such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Daniel Y. Gielchinsky
Daniel Y. Gielchinsky, P.A.
dan@dyglaw.com
Florida Bar No. 97646
Meera Khan, Esq.
meerakhan@dyglaw.com
Florida Bar No. 1015336

*Attorney for Plaintiff Tymar Distribution LLC*
1132 Kane Concourse, Suite 204
Bay Harbor Islands, Florida 33154
Telephone: (305) 763-8708


/s/ Mark Schlachet
Law Offices of Mark Schlachet
43 West 43rd Street, Suite 220
New York, New York 10036-7424
Telephone: (216) 225-7559
markschlachet@me.com

9511 Collins Avenue, Ste. 605
Surfside, FL 33154

*(PRO HAC VICE APPLICATION
FORTHCOMING)*