UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  21-21976-CIV-ALTONAGA/Torres

TYMAR DISTRIBUTION LLC,

      Plaintiff,

v.

MITCHELL GROUP USA, LLC; *et al.*,

      Defendants.

_____/

**ORDER**

**THIS CAUSE** came before the Court on Defendants, Mitchell Group USA, LLC ("MGU")

and Rivelle Products, Inc.'s Joint Motion to Dismiss the Complaint [ECF No. 24], filed on July

15, 2021.  Plaintiff, Tymar Distribution LLC, filed a Response [ECF No. 26]; to which Defendants

filed a Reply [ECF No. 34].  The Court has carefully considered the Complaint [ECF No. 1], the

parties' written submissions, the record, and applicable law.  For the following reasons, the Motion

is granted.

## I.      BACKGROUND

This action arises from Defendants' brand-protection practices, which are allegedly aimed

at insulating Defendants' system of minimum-advertised pricing from intrabrand competition, to

the harm of Plaintiff and Florida consumers.  (*See generally* Compl.).  Plaintiff is a Rhode Island

limited liability company with its principal place of business in Rhode Island.  (*See id.* ¶ 13).  MGU

is a Florida limited liability company with its principal place of business in Florida.  (*See id.* ¶ 14).

At the time of the events at issue, Rivelle Products, Inc. was a California corporation; on January

19, 2021, it merged into a Florida corporation bearing the same name.  (*See id.* ¶ 15).

Plaintiff is an Amazon seller (*see id.* ¶ 42) that in 2018 "listed approximately 300 brand names on amazon.com[] and sold over 150,000 units of product to customers on Amazon with a 99% lifetime positive feedback rating" (*id.* ¶ 43 (alterations added)).   "MGU is the exclusive United States distributor of certain French-made personal care products" from the brand Fair & White ("F&W"), through its Amazon merchant store, Beauty Dreams.  (*Id.* ¶ 24).  Rivelle is the exclusive Fulfilled-by-Amazon distributor of many F&W products for MGU's Amazon store and generally serves as "a mail order source of health and beauty products[.]"  (*Id.* ¶ 26 (alteration added)).  Rivelle also "added 'electronic shopping' [services] as a second endeavor" (*id.* (alteration added)), including the brand-protection services that form the basis of Plaintiff's Complaint (*see id.* ¶ 27; *see generally id.*).

Plaintiff operates in a so-called "grey market," which Plaintiff defines as "trade of a commodity through distribution channels that are not authorized by the original manufacturer or trade mark [sic] proprietor."  (*Id.* ¶ 7 n.5 (quotation marks and citation omitted)).  On Amazon, companies who deal in the grey market, such as Plaintiff, "sourc[e] products at wholesale, from an authorized distributor of a manufacturer, []from the manufacturer itself, or from a downstream purchaser, and sell[] it [sic] at an enhanced retail price point online, but often at a cheaper price than other sellers are selling it [sic], thus benefiting consumers, who get authentic product[s] at a discount."  (*Id.* ¶ 5 (alterations added)).  These activities, while not violative of Amazon policy (*see id.* ¶¶ 38–39), "threaten the profits of manufacturers who attempt to maintain a system of [m]inimum[-a]dvertised [p]ricing" (*id.* ¶ 7 (alterations added)).  To combat grey-market dealers, some companies, including Rivelle, offer brand-protection services.  (*See id.* ¶¶ 26–27; 49).  These services include policing the grey market by identifying unauthorized sellers on Amazon so the

intellectual property ("IP") owner may enforce its rights via Amazon's infringement notification protocols.  (*See id.* ¶¶ 8, 35, 36).

After purchasing F&W inventory from MGU on May 3, 2018, Plaintiff began selling F&W products soon thereafter.  (*See id.* ¶¶ 53–54).  Despite selling at prices below MGU's system of minimum-advertised pricing, Plaintiff's F&W profit margin was 22.1 percent.  (*See id.* ¶¶ 43–44).  Unbeknownst to Plaintiff, around May 2018, MGU formed a business relationship with Rivelle, "established [Rivelle] as its Amazon brand protector[;] and gave [it] exclusive or substantially exclusive access . . . to the most popular F&W products."  (*Id.* ¶ 60 (alterations added)).  On May 29, 2018, MGU — or, according to Plaintiff, Rivelle in disguise — sent Plaintiff a warning under the Digital Millennium Communications Act, complaining of copyright infringement and offering to withdraw the notice if Plaintiff refrained from selling F&W products on Amazon.  (*See id.* ¶ 55).

Plaintiff did not heed MGU's warnings.  (*See id.*).  When Plaintiff would not comply, MGU upped the ante and lodged IP complaints with Amazon in late June 2018, "alleging copyright infringement and trademark infringement."  (*Id.* ¶ 58).  Plaintiff continued selling F&W products, so MGU/Rivelle upped the ante once again in July 2018, filing additional IP complaints which alleged "a far more serious charge of counterfeiting" — even though the listed F&W products were purchased from MGU.  (*Id.* ¶ 62).  Per Amazon policy, the F&W listings were removed pending investigation.  (*See id.*).

To substantiate the products' authenticity, Plaintiff produced its invoices from MGU to Amazon, and Amazon reversed its decisions and restored the listings.  (*See id.* ¶¶ 62, 65).  This cycle persisted for several months, culminating in 41 total IP complaints.  (*See id.* ¶ 65).  After

Rivelle/MGU's "relentless pursuit" of Plaintiff, Amazon finally suspended Plaintiff's account on October 18, 2018, following an October 2, 2018 counterfeiting complaint.  (*Id.* ¶ 70).

"Amazon stated that it took Defendants' accusations very seriously" (*id.* ¶ 86), and "it would act favorably if MGU would retract its accusations" (*id.* ¶ 87).  "Without a seller retraction[, Plaintiff] was helpless to prove its case."  (*Id.* ¶ 73 (alteration added)).  Thus, "[w]ith its entire business shut down, [Plaintiff] had no alternative, in mitigation of its damages, but to hire a consultant . . . and thereafter agree to cease its sales of F&W products on Amazon in exchange for MGU's retraction of [the] IP [c]omplaints and concomitant account reinstatement."  (*Id.* ¶ 74 (alterations added)).  Plaintiff and MGU agreed that MGU/Rivelle would retract the IP complaints if Plaintiff ceased sales of F&W products on Amazon.  (*See id.* ¶ 75; *see also generally id.*, Ex. 10 [ECF No. 1-10]).  Sure enough, Plaintiff's account suspension was lifted after 18 days.  (*See id.* ¶¶ 87–88).

Plaintiff highlights price increases of three F&W products resulting from MGU/Rivelle's brand-protection practices: (1) F&W Original Serum One, which "sold for between $6[.00] and $14.50 since 2014[,]" but later increased in price to sell for "between $14 and $39.99"; (2) F&W So White Skin Perfector Lightening Cream, which "generally sold for between $4[.00] and $12[.00] since 2012" and later increased to a range "between $14.32 and $14.99"; and (3) F&W Original Lightening & Brightening Glycerin Lotion, which "sold for between $7[.00] and $10[.00] since 2016" but increased to $18.99.  (*Id.* ¶ 79 (alterations added)).  Plaintiff alleges these price increases have stabilized at artificially high levels.  (*See id.* ¶ 78).

Plaintiff filed its Complaint asserting two claims against Defendants: Count I alleges tortious interference with existing and prospective business relationships, and Count II alleges a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  (*See generally*

*id.*).  Defendants move to dismiss Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and, alternatively, under Rule 12(b)(6) for failure to state claims for relief.  (*See generally* Mot.).

## II.   STANDARDS

***Rule 12(b)(1) — Subject Matter Jurisdiction***.  "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Thus, subject matter jurisdiction must be established before a case can proceed on the merits.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–95 (1998).  It is presumed that a federal court lacks jurisdiction in a case until the plaintiff demonstrates the court has jurisdiction over the subject matter.  *See Kokkonen*, 511 U.S. at 377 (citing *Turner v. Bank of N. Am.*, 4 U.S. (4 Dall.) 8, 11 (1799); *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 182–83 (1936)). "[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case[.]" *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001) (alterations added; citations omitted).

Under Rule 12(b)(1), a defendant may lodge a facial or factual attack on the court's subject matter jurisdiction.  *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). A facial attack asserts that a plaintiff has failed to allege a basis for subject matter jurisdiction in the complaint.  *See id.*  In a facial attack, the plaintiff's allegations are taken as true, and the plaintiff is afforded safeguards like those provided in challenging a Rule 12(b)(6) motion raising the failure to state a claim for relief.  *See Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (citation omitted).

By contrast, a factual attack "challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits,

are considered." *Menchaca*, 613 F.2d at 511 (citation omitted).  In a factual attack, courts may weigh the evidence presented, no presumption of truth attaches to the plaintiff's allegations, and the existence of disputed material facts does not prevent the trial court from deciding the merits of the jurisdictional claims.  *See Lawrence*, 919 F.2d at 1529 (citations omitted).  Moreover, "[i]n the face of a factual challenge to subject matter jurisdiction, the burden is on the plaintiff to prove that jurisdiction exists."  *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (alteration added; citations and footnote call number omitted).

   ***Rule 12(b)(6) — Failure to State a Claim***.  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (alteration added; quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted). Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

   When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take its factual allegations as true.  *See Brooks v. Blue Cross & Blue*

*Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

### III.    DISCUSSION

***Motion to Dismiss for Lack of Subject Matter Jurisdiction***.   As a threshold matter, Defendants facially attack the Court's subject matter jurisdiction over Plaintiff's claims.  (*See* Mot. 8–11).  Defendants argue that Plaintiff fails to adequately plead damages sufficient to satisfy the amount-in-controversy required to invoke diversity jurisdiction under 28 U.S.C. section 1332(a). (*See* Mot. 8–11).  According to Defendants, the "Complaint fails to allege more than $75,000 in damages that could actually be recovered by [Plaintiff] if it succeeded on both its tortious interference and FDUTPA claims."  (*Id.* 8 (alteration added)).

"[T]o invoke a federal court's diversity jurisdiction, a plaintiff must claim, among other things, that the amount in controversy exceeds $75,000."  *Federated Mut. Ins. Co. v. McKinnon Motors, LLC*, 329 F.3d 805, 807 (11th Cir. 2003) (citing 28 U.S.C. § 1332).  "A plaintiff satisfies the amount in controversy requirement by claiming a sufficient sum in good faith."  *Id.* (citing *St. Paul Mercury Indem. v. Red Cab Co.*, 303 U.S. 283, 298 (1938)).

Where a plaintiff alleges indeterminate damages, it must prove "by a preponderance of the evidence that the claim on which it is basing jurisdiction meets the jurisdictional minimum."  *Id.* (citation omitted).  By contrast, where — as here — a plaintiff pleads a specific amount of damages, a defendant may obtain dismissal only if it appears "to a legal certainty that the claim is really for less than the jurisdictional amount[.]"  *Red Cab Co.*, 303 U.S. at 289 (footnote call number omitted).  A defendant may demonstrate the "absence of jurisdictional amount to a legal certainty when state law bars recovery of the type of damages claimed."  *Klepper v. First Am. Bank*, 916 F.2d 337, 341 (6th Cir. 1990) (citation omitted); *see also Leonard v. Enter. Rent a Car*,

279 F.3d 967, 972–74 (11th Cir. 2002) (holding applicable state law did not provide for attorney's fees, which accordingly could not count toward the jurisdictional threshold).

Defendants argue that Plaintiff's FDUTPA claim seeks lost profits damages, which are not recoverable under the FDUTPA. (*See* Mot. 10–11). The parties cite a wealth of persuasive authority in support of their competing positions. (*See id.*; Resp. 8–10). Defendants contend the FDUTPA only allows for the recovery of actual damages, and "lost profits are not 'actual damages,' but instead are merely a type of consequential damages, and therefore are not recoverable under [the] FDUTPA." (Mot. 10 (alteration added; citation omitted)). According to Plaintiff, "the accepted definition of actual damages in a consumer's FDUTPA case is meaningless in a competitor's case, where actual lost profits are the competitor's actual damages." (Resp. 9 (quotation marks and citations omitted)). Moreover, Plaintiff argues that "Florida state courts . . . have dispelled the notion that lost profits are always consequential damages, noting that the issue may turn on whether such damages flow directly and immediately from the interference." (*Id.* (alteration added; quotation marks and citation omitted)). Finally, Plaintiff states "the weight of Florida law holds past lost profits recoverable under [the] FDUTPA[.]" (*Id.* (alterations added)). The Court agrees with Plaintiff.

The FDUTPA, which prohibits deceptive and unfair trade practices, only permits the recovery of "actual damages[,]" which the Act does not define. Fla. Stat. § 501.211(2) (alteration added). When the Florida legislature enacted the FDUTPA, it notably permitted only a "consumer" to state a claim for damages. *See* 1973 Fla. Laws 679 (amended by 2001 Fla. Laws ch. 2001-39 section 6 and currently codified at section 501.211(2), Florida Statutes); *cf.* Fla. Stat. § 501.211(1) (since enactment by 1973 Fla. Laws 679, permitting "anyone aggrieved" to seek equitable relief). Thus, when faced with the task of defining actual damages under the FDUTPA,

one Florida district court of appeal adopted a Texas court's measure of damages under the Texas

Deceptive Trade Practices Act, which is similar to the FDUTPA,[1] stating:

> Generally, the measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.  A notable exception to the rule may exist when the product is rendered valueless as a result of the defect — then the purchase price is the appropriate measure of actual damages.

*Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984) (alterations adopted; citation

omitted).  This benefit-of-the-bargain damages measure "utilizes an expectancy theory, evaluating

the difference between the value as represented and the value actually received."  *Dorestin v.*

*Hollywood Imps., Inc.*, 45 So. 3d 819, 827 (Fla. 4th DCA 2010) (Gross, C.J., concurring specially)

(alteration adopted; quotation marks and citation omitted).

 Following the *Rollins* court's lead, other Florida district courts of appeal have adopted this

narrow view on recoverable actual damages, *see id.* at 827 n.4 (collecting cases), and have gone a

step further, holding "'actual damages' under [the] FDUTPA do not include 'consequential,'

'special,' or 'incidental' damages[,]" *id.* at 828 (alterations added; footnote call numbers omitted;

collecting cases).  The Supreme Court of Florida has not adopted these definitions.

 In 2001, the Florida Legislature amended the FDUTPA to replace the word "consumer"

with "person," 2001 Fla. Laws ch. 2001-39 § 6 (amending section 501.211(2) as described),

causing Florida's appellate courts to hold that corporate-competitor plaintiffs, rather than just

consumers, can seek damages under the FDUTPA.  *See generally Digiport, Inc. v. Foram Dev.*

*BFC, LLC*, 314 So. 3d 550 (Fla. 3d DCA 2020) (claim by a company for misappropriation of trade

---

[1] The Texas Supreme Court permits plaintiffs to seek lost profits under the Texas Deceptive Trade Practices Act.  *See White v. Sw. Bell Tel. Co.*, 651 S.W.2d 260, 262–63 (Tex. 1983) (holding a consumer could seek lost profits damages arising from a telephone company's incorrect listing of his telephone number in the yellow pages).

secrets); *Bailey v. St. Louis*, 196 So. 3d 375 (Fla. 2d DCA 2016) (claim by a company on unfair competition grounds).  Many federal district courts agree.  *See Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1372–74 (S.D. Fla. 2010) (collecting cases).

Of course, in a claim brought by a corporate competitor, there is no bargain giving rise to the expectancy measure of damages employed in traditional consumer cases.  *Compare H & J Paving of Fla., Inc. v. Nextel, Inc.*, 849 So. 2d 1099, 1102 (Fla. 3d DCA 2003) (awarding the plaintiff the difference in value of radio system at time of sale based on promised lifespan of eight years and value of system that would be rendered obsolete in a few years because of the defendant's deceptive practice) *with CRMSuite Corp. v. General Motors Co.*, No. 8:20-cv-762, 2021 WL 914170, at *6 n.8 (M.D. Fla. March 10, 2021) (corporate-competitor plaintiff could collect expenses caused by FDUTPA violation, because "damages in these non-traditional cases are typically those directly caused by the unfair or deceptive acts." (collecting cases)).  Corporate competitors instead suffer lost profits, lost revenue, reputational harm, and other damages commonly observed in business torts claims rather than contract-based causes of action.  *See ADT LLC v. Alarm Prot. Tech. Fla., LLC*, No. 12-80898-Civ, 2013 WL 11276119, at *5 (S.D. Fla. Apr. 18, 2013); *see also Marco Island Cable v. Comcast Cablevision of S., Inc.*, 312 F. App'x 211, 213–14 (11th Cir. 2009) (affirming jury award of damages caused by the corporate competitor's deceptive and unfair practices measured by the business's diminished value).

Court decisions evaluating the damages available to a competitor company under the FDUTPA vary widely.  Federal district courts are split: many have held past lost profits are available,[2] and many others have refused to permit plaintiffs to seek lost profits at all, applying the

---

[2] To be sure, "there is no substantive distinction between past lost profits and future lost profits for purposes of determining whether past lost profits are actual damages." *Midway Labs USA, LLC v. S. Serv. Trading, S.A.*, No. 19-24857-Civ, 2020 WL 2494608, at *7 (S.D. Fla. May 14, 2020).

CASE NO. 21-21976-CIV-ALTONAGA/Torres

benefit-of-the-bargain measure of damages. *Midway Labs USA, LLC*, 2020 WL 2494608, at *6 (collecting cases and noting split). Yet, many of these cases did not engage in a significant analysis of the issue. *See id.* at *7 (acknowledging the conclusory nature of several courts' analyses). Recently, one Florida district court of appeal favorably cited a federal district court[3] that awarded past lost profits to a corporate competitor. *See Digiport, Inc.*, 314 So. 3d at 554 (holding there was no error "to the extent the trial court precluded an award of *future* lost profits" (emphasis added) (citing *Factory Dir. Tires Inc. v. Cooper Tire & Rubber Co.*, No. 3:11-cv-255, 2011 WL 13117118, at *7 (N.D. Fla. Oct. 24, 2011)) (other citation omitted). *Cf. Stewart Agency, Inc.*, 266 So. 3d at 214 (acknowledging entities often "do not suffer actual damages[;] their damages are frequently special or consequential damages, and thus, not compensable[.]" (alterations added)).

The Florida Supreme Court previously defined "actual damages" when construing a libel statute. *See Ross v. Gore*, 48 So. 2d 412, 414 (Fla. 1950). In *Ross*, the statute permitted recovery of "only actual damages[,]" *id.* at 413 (alteration added), and the Florida Supreme Court stated "[s]ince [the term 'actual damages'] is used synonymously with 'compensatory damages' in many of our decided cases, we think it is fair to assume that 'actual damages' mean 'compensatory damages.'" *Id.* at 414 (alterations added). The Florida Supreme Court continues to use the terms actual damages and compensatory damages interchangeably. *See, e.g.*, *Bidon v. Dep't of Prof. Reg., Fla. Real Estate Comm'n*, 596 So. 2d 450, 452 (Fla. 1992). Even the *Rollins* court acknowledged that "actual damages [are] generally considered synonymous with compensatory damages, in contradistinction to punitive damages." 454 So. 2d at 585 (alteration added) (citing 2 Words and Phrases 363 (1955)).

---

[3] Florida courts often cite federal decisions interpreting the FDUTPA as persuasive authority. *See Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 213 n.2 (Fla. 4th DCA 2019).

The Florida Supreme Court broadly defines compensatory damages as those which "arise from actual and indirect pecuniary loss, mental suffering, value of time, actual expenses, and bodily pain and suffering." *Margaret Ann Super Mkts., Inc. v. Dent*, 64 So. 2d 291, 292 (Fla. 1953) (quotation marks and citation omitted). Lost profits are certainly compensatory damages. *See, e.g.*, *Fort Lauderdale Lincoln Mercury, Inc. v. Fallaro*, 616 So. 2d 594, 595 (Fla. 4th DCA 1993) (characterizing lost profits as compensatory damages). And in claims with no underlying transaction, such as business torts, lost profits are often directly caused by a defendant's wrongful act and recoverable simply as compensatory damages. *See, e.g.*, *Ins. Field Servs., Inc. v. White & White Inspection & Audit Serv., Inc.*, 384 So. 2d 303, 308 (Fla. 5th DCA 1980) ("Here, there is no question but that the tortious interference of appellants was the direct cause of appellee's lost profits[.]" (alteration added)).

By contrast, courts generally limit their categorization of damages as "consequential" to claims sounding in contract, and the definition of consequential damages as those arising "from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting." *Hardwick Props., Inc. v. Newbern*, 711 So. 2d 35, 40 (Fla. 1st DCA 1998) (quotation marks and citation omitted).[4] Put another way, consequential damages are those that do not "flow[] directly from the parties' immediate *transaction*." *HCA Health Servs. of Fla., Inc.*, 204 So. 3d at 471 n.2 (emphasis and alteration added). Where, as here, the claim does not involve any breach of contract, warranty, or similar wrong sounding in contract, any line drawing

---

[4] Even in contract cases, lost profits damages are often, but not always, consequential in nature. *See, e.g.*, *HCA Health Servs. of Fla., Inc. v. CyberKnife Ctr. of Treasure Coast, LLC*, 204 So. 3d 469, 471 n.2 (Fla. 4th DCA 2016) ("[L]ost profits do not *always* constitute consequential damages as a matter of law . . ." and are "recoverable as general damages where they flow directly and immediately from the breach of contract." (alteration added; emphasis in original; quotation marks and citation omitted)).

between expectancy and consequential damages is rather inapt.  *See id.*; *cf. Safeco Title Ins. Co. v. Reynolds*, 452 So. 2d 45, 49 (Fla. 2d DCA 1984) ("Damages for torts arising out of contracts are governed by the same rules as in the case of contract actions.").

The above principles suggest a much larger universe of damages available in FDUTPA claims arising outside the consumer transaction context, *cf. Dent*, 64 So. 2d at 292 (describing the breadth of compensatory damages available under Florida law in a tort case), especially when considered alongside the liberal construction courts must afford the FDUTPA to accomplish its remedial purpose, *see* Fla. Stat. § 501.202.  It makes considerable sense to permit a corporate-competitor plaintiff to seek lost profits damages when there is no transaction giving rise to the oft-used expectancy measure of damages.  *See ADT LLC v. Alarm Prot. Tech. Fla., LLC*, No. 12-80898-Civ, 2013 WL 11276119, at *5 (S.D. Fla. Apr. 18, 2013) (holding a corporate competitor could seek its lost profits under the FDUTPA because a "competitor has not purchased a worthless product[;]" thus "[the] competitor's actual damages in a FDUTPA case are its 'actual lost profits' suffered by reason of the unfair trade practices."  *Id.* (alterations added; citations omitted)).

The Court joins other federal district courts in holding a corporate-competitor plaintiff may seek lost profits damages under the FDUTPA.  Accordingly, the Court has subject matter jurisdiction because Plaintiff may seek lost profits damages under its FDUTPA claim and meets the jurisdictional requirement.

***Motion to Dismiss for Failure to State a Claim***.  Having concluded subject matter jurisdiction exists over Plaintiff's claims, the Court next addresses Defendants' merits-based arguments for dismissal.

*Tortious Interference (Count I)*.  Defendants contend Plaintiff's tortious interference claim is barred by the single-action rule.  (*See* Mot. 12–15).  The Court agrees.

"In Florida, a single publication gives rise to a single cause of action." *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002) (citation omitted). In other words, "[t]he various injuries resulting from it are merely items of damage arising from the same wrong." *Id.* (citation omitted).  This rule, called the single-publication or single-action rule, "is designed to prevent plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm." *Id.* (quotation marks and citations omitted); *see also Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014).  Thus, a factually repetitive count fails unless it "set[s] forth an independent tort for the recovery of damages[.]" *Boyles v. Mid-Fla. Television Corp.*, 431 So. 2d 627, 636 (Fla. 5th DCA 1983) (alterations added; emphasis omitted).

In reliance on the single-action rule, courts dismiss concurrent counts for related torts based on the same publication and underlying facts as a failed defamation count.  *See Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1339–40 (S.D. Fla. 1998) (dismissing false light privacy claim arising from same allegedly defamatory publication); *Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992) ("[T]he successful invocation of a defamation privilege *will* preclude a cause of action for intentional infliction of emotional distress if the sole basis for the latter cause of action is the defamatory publication." (alteration added; emphasis in original)).  And courts likewise dismiss alternative tort claims even where the defamation count does not fail.  *See, e.g.*, *Boyles*, 431 So. 2d at 636 (dismissing intentional infliction of emotion distress claim where the "outrageous conduct" was defamation, and the claim was "merely an imperfect repetition" of the defamation claim); *Kamau v. Slate*, No. 4:11cv522, 2012 WL 5390001, at *7–8 (N.D. Fla. Oct. 1, 2012) (allowing the plaintiffs to amend their defamation claim, but dismissing counts for injurious

falsehood and interference with business reputation because they relied on same event as defamation claim).

Along the same vein, the single-action rule requires application of Florida's two-year defamation statute of limitations, even when a plaintiff does not plead a defamation count. *See MYD Marine Distribs., Inc. v. Donovan Marine, Inc.*, No. 07-61624-Civ, 2009 WL 701003, at *2–5 (S.D. Fla. Mar. 16, 2009) (dismissing tortious interference and negligent supervision claims under the defamation statute of limitations, where the tortious conduct was premised on defamatory statements); *cf. Callaway Land & Cattle Co.*, 831 So. 2d at 208 ("Thus, if the defamation count fails, the other counts based on the same publication must fail as well because the same privileges and defenses apply." (citation omitted)).

Defendants state dismissal of Plaintiff's tortious interference claim is required because (1) it is based on the same underlying facts as a failed defamation count[5]; (2) even without considering the failed defamation claim, the tortious interference claim is still barred because it is premised on defamatory conduct; and (3) the single-action rule requires application of Florida's two-year defamation statute of limitations, which bars the claim. (*See* Mot. 12–15). Plaintiff's response is two-fold. Plaintiff argues: (1) the single-action rule only bars concurrent counts, and where no defamation claim is pleaded, the single-action rule is inapposite (*see* Resp. 12–13); and (2) the

---

[5] Plaintiff previously sued over the same conduct in the Eastern District of New York, alleging violations of Section 1 of the Sherman Act, defamation, and tortious interference under New York law. *See Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, No. 20-cv-719, Mem. & Order [ECF No. 77] at 1–11, filed Mar. 31, 2021 (E.D.N.Y. 2021). The district court dismissed the Sherman Act and defamation claims on the merits and declined to exercise supplemental jurisdiction over the remaining tortious interference claim. *See id.* at 45. Defendants urge the Court to consider the New York district court's order not as *res judicata* but as a predicate to several of Defendants' arguments. (*See* Mot. 8). While Plaintiff does not oppose this request, it highlights the "abstraction" of Defendants' arguments about the New York case and emphasizes that Defendants do not argue *res judicata*. (Resp. 15). As will be shown by the Court's discussion *infra*, the merits of the New York claims are irrelevant to the Court's analysis.

single-action rule is inapplicable where the wrong is directed at a business relationship rather than "a public attack on one's morals" (Resp. 12 (citation omitted)).  Defendants' position is correct.

The underpinnings of the single-action rule make clear that it does not matter whether the defamation claim fails, succeeds, or is not brought at all.  *See Callaway Land & Cattle Co.*, 831 So. 2d at 208.  Strategically not pleading a defamation count to avoid application of the rule is the type of gamesmanship contemplated by *Callaway* and would allow a plaintiff to "circumvent[] a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm." *Id.* (alteration added; citations omitted)); *see also Gannett Co. v. Anderson*, 947 So. 2d 1, 8–9 (Fla. 1st DCA 2006) (plaintiff could not avoid defamation statute of limitations by amending claim from describing publication as "false and defamatory" to one "worded in such a way to portray the plaintiff in a false light." (alteration adopted; quotation marks omitted)).  Certainly, "the protections afforded by [defenses to defamation] cannot be undone by engaging in a semantic exercise such as this." *Id.* at 8 (alteration added).

Plaintiff's position that the single-action rule does not apply because of the category of harm alleged is premised on the Restatement of Torts and New York courts' application of the Restatement's position.  (*See* Resp. 10–13).  The Restatement distinguishes between categories of claims premised on false statements; some fall into the category of "intentional interference with economic relations" or "injurious falsehoods" and others involve "more general harm to reputation[.]"  *Callaway Land & Cattle Co., Inc.*, 831 So. 2d at 209 (alteration added; citations omitted)).  Applying this theory, New York courts distinguish between torts sounding in tortious interference rather than defamation and ask whether the alleged injury is to a specific business relationship or merely reputational.  *See, e.g.*, *Amaranth LLC v. J.P. Morgan Chase & Co.*, 888

N.Y.S.2d 489, 71 A.D.3d 40, 47–48 (N.Y. App. Div. 2009). Under New York law, the latter is usually time-barred, but the former may proceed. *See id.*

Florida has not adopted the Restatement's view, and, in fact, *Callaway* explicitly rejected the Restatement's characterization as inconsistent with Florida law. *See* 831 So. 2d at 209–210. The *Callaway* court analyzed slander of title, which is defined as "defamation of property interest," and held the defamation two-year statute of limitations applied. *See id.* at 209 (citation omitted). In its reasoning, the court specifically acknowledged — and rejected — the Restatement's position, stating "the courts of this state do not distinguish defamation of property from defamation of a person[.]" *Id.* (alteration added). Quite similarly, Plaintiff cannot avoid application of the statute of limitations by distinguishing between harm to a specific business relationship and harm to personal reputation. "A contrary result would allow [Plaintiff] to circumvent the statute of limitations by simply re-describing the [defamation] action to fit a different category of intentional wrong." *Id.* at 208 (alterations added; citation omitted).

Thus, the single-action rule and the imputed defamation statute of limitations defense both bar Plaintiff's tortious interference claim because the claim is premised on defamatory statements and does not "set forth an independent tort for the recovery of damages[.]"[6] *Boyles*, 431 So. 2d at 636 (emphasis omitted; alteration added).

---

[6] Although Plaintiff does not raise this argument to avoid dismissal of its tortious interference claim (*see generally* Resp.), to the extent it seeks recovery under a tortious interference theory premised on Defendants' purported "[e]conomic [p]ressure" that caused Plaintiff to forego its F&W product sales (Resp. 7–8 (alterations added; citing Restatement (Second) of Torts § 767 cmt. c. (Am. Law Inst. 1979)), that theory is without merit under Florida law. *See KMS Restaurant v. Wendy's Int'l*, No. 95-08546-Civ, Order Affirm. R. & R. [ECF No. 168] filed July 30, 1998 (S.D. Fla. 2009) (entering judgment in favor of the defendant and holding plaintiff's tortious interference theory was not recognized under Florida law where the plaintiff alleged the defendant tortiously interfered with a business relationship by making certain representations to the *plaintiff*, thereby causing the *plaintiff* to terminate his own relationship with his business partners), *aff'd* 209 F.3d 722 (Table) (11th Cir. 2000).

*FDUTPA (Count II).*   Defendants argue that Plaintiff's FDUTPA claim cannot stand because the Complaint does not adequately allege consumer harm.  (*See* Mot. 17–18; Reply 7–9). The Court agrees.

The FDUTPA provides a cause of action for "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"  Fla. Stat. § 501.204(1) (alterations added).  FDUTPA violations can occur two ways: (1) *per se*, when "premised on the violation of another law proscribing unfair or deceptive practice[,]" or (2) a traditional violation involving some other "unfair or deceptive practice."  *Felice v. Invicta Watch Co. of Am.*, No. 16-cv-62772, 2017 WL 3336715, at *2 (S.D. Fla. Aug. 4, 2017) (quotation marks and citation omitted).

"An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (quotation marks and citations omitted).  An act is deceptive "if there is a representation, omission[,] or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."  *Millennium Commc'ns & Fulfillment, Inc. v. Off. of the Att'y Gen., Dep't of Legal Affs., State of Fla.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000) (alteration added; quotation marks and citation omitted).

According to Defendants, Plaintiff's FDUTPA claim fails because the Complaint "fails to allege harm to consumers for purposes of articulating a claim under the FDUTPA."  (Mot. 18 (quotation marks and citation omitted)).  Defendants essentially posit that the FDUTPA's definition of consumer harm in this circumstance parallels the definition of consumer harm under the Sherman Act.  (*See id.*).  Thus, they argue, for the same reason Plaintiff's New York antitrust claims failed — where Plaintiff was unable to demonstrate anticompetitive effect and,

consequently, consumer harm — so, too, should its FDUTPA claim.  (*See* Reply 7–9).  Plaintiff asserts that, although its claims were "inadequate to meet Section 1 [of the Sherman Act]'s 'anticompetitive' rigors, [Defendants' conduct here] is not thereby less unfair and deceptive under [the] FDUTPA."  (Resp. 17 (alterations added)).  Yet, Plaintiff fails to support this argument with any authority.[7]  (*See* Resp. 17).  The Court is unconvinced by Plaintiff's flimsy, conclusory assertion that the FDUTPA's definition of consumer harm in a competition case should be construed any differently from consumer harm under the Sherman Act.

Under the Sherman Act, "[t]o allege actual harm to competition, [p]laintiffs must 'point to the specific damage done to consumers in the market.'"  *GolTV, Inc. v. Fox Sports Latin Am., Ltd.*, No. 16-24431-Civ, 2018 WL 1393790, at *21 (S.D. Fla. Jan. 26, 2018) (alterations added; other alterations adopted; quoting *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010)).  Consumer harm under the Sherman Act parallels consumer harm under the FDUTPA. *See id.* (holding plaintiff's FDUTPA claim could not proceed where its antitrust claim failed to allege harm to consumers, because "as is the case for antitrust claims, claims under the FDUTPA require harm to consumers.").

As a general matter, reduction in intrabrand competition is not an anticompetitive effect under the Sherman Act.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007).  This is because economic theory suggests a reduction in intrabrand competition actually *benefits* consumers: it "encourages retailers to invest in tangible or intangible services or

---

[7] "The onus is upon the parties to formulate arguments."  *Hewlett-Packard Co. v. CP Transp. LLC*, No. 12-21258-Civ, 2012 WL 4795766, at *2 (S.D. Fla. Oct. 9, 2012) (alteration adopted; quotation marks and footnote call number omitted; quoting *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); other citation omitted).  "When parties do not fully develop their arguments and support them with citation to legal authority, the burden upon the [c]ourt is improperly increased."  *Id.* (alteration added).  It is simply "not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (alteration adopted; citations omitted).?

promotional efforts that aid the manufacturer's position against rival manufacturers." *Id.* at 889–93.  Indeed, "[a] minimum resale price restraint can also increase consumer welfare by creating new options ranging from 'low-price, low-service brands; high-price, high-service; and brands that fall in between.'" *AT&T Mobility LLC v. Phone Card Warehouse, Inc.*, No. 6:08-cv-1909, 2009 WL 10671271, at *6 (M.D. Fla. Dec. 14, 2009) (quoting *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 890)).

Moreover, as Defendants point out, in situations like this where interbrand competition is present, "consumers can avoid increased [intrabrand] prices by easily switching to a competing brand[; thus] no consumer harm has occurred."  (Reply 8 (alterations added; citing *Dunnivant v. Bi-State Auto Parts*, 851 F.2d 1575, 1583 (11th Cir. 1988) ("If intrabrand competition exists, this will afford a safeguard against any attempt to exploit intrabrand market power.") (quotation marks and citations omitted)).

Here, Plaintiff alleges only a decrease in intrabrand competition and no other anticompetitive effect by which the Court can infer consumer harm.  (*See* Compl. ¶¶ 78–79, 92).  But "an antitrust plaintiff must allege injury to competition, not merely to the plaintiff as a competitor."  *GolTV, Inc.*, 2018 WL 1393790, at *16–17 (citations omitted).  Consumers may very well benefit from the decrease in intrabrand competition.  *See AT&T Mobility LLC*, 2009 WL 10671271, at *6.  Moreover, when faced with increased F&W prices, consumers could "switch to other competing personal-care product brands."  (Reply 8); *see Leegin Creative Leather Prods., Inc.*, 551 U.S. at 890–92.  Simply put, Plaintiff has not sufficiently alleged consumer harm, and its FDUTPA claim must be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, it is

CASE NO. 21-21976-CIV-ALTONAGA/Torres

**ORDERED AND ADJUDGED** that Defendants, Mitchell Group USA, LLC and Rivelle Products, Inc.'s Joint Motion to Dismiss the Complaint **[ECF No. 24]** is **GRANTED**. The Complaint **[ECF No. 1]** is **DISMISSED** without prejudice.  Plaintiff is granted leave to amend its Complaint, in accordance with this Order, by **September 17, 2021**.

**DONE AND ORDERED** in Miami, Florida, this 8th day of September, 2021.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record